AO 91 (Rev. 11/11) Criminal Complaint (Rev. by USAO on 3/12/20) ☐ Original ☐ Duplicate Original

LODGED
CLERK, U.S. DISTRICT COURT
9/11/2026
CENTRAL DISTRICT OF CALIFORNIA
BY: KMA DEPTUTY

# UNITED STATES DISTRICT COURT

for the

Central District of California

FILED
CLERK, U.S. DISTRICT COURT
09/11/2026
CENTRAL DISTRICT OF CALIFORNIA
BY: KL DEPUTY

United States of America,

v.

Marvin Angelito,
Susan Gonzalez,

Defendants.

Case No. 2:26-mj-05386-DUTY

## CRIMINAL COMPLAINT

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

On or about the date of September 10, 2026, in the county of Los Angeles in the Central District of California, the defendants violated:

| *Code Section* | *Offense Description* |
|---|---|
| 21 U.S.C. § 841(a)(1) | Possession with intent to distribute fentanyl |

This criminal complaint is based on these facts:

*Please see attached affidavit.*

☒ Continued on the attached sheet.

*/s/ Brent James*
*Complainant's signature*

Brent James, Special Agent
*Printed name and title*

Sworn to before me and signed in my presence.

Date: September 11, 2026

*Judge's signature*

City and state: Los Angeles, California

Hon. Diana M. Kwok, U.S. Magistrate Judge
*Printed name and title*

AUSA: Lloyd Masson (x0282)

**AFFIDAVIT**

I, Brent James, being duly sworn, declare and state as follows:

## I. INTRODUCTION

1. I am a Special Agent ("SA") with the Federal Bureau of Investigation ("FBI") and have been so employed since September 2015. As a requirement for employment as an FBI Special Agent, I successfully completed the 21-week New Agent Basic Field Training Course at the FBI Training Academy in Quantico, Virginia. As a function of my assignment, I have received both formal and informal training from the FBI and other institutions regarding computer technology, financial investigations, cryptocurrency, and drug trafficking organizations.

2. I have conducted and participated in criminal investigations for violations of federal and state laws including, but not limited to, narcotics trafficking, computer-based financial crimes, money laundering, firearms, fraud, and other organized criminal activity. I have prepared, executed, and assisted in numerous search and arrest warrants. I have also conducted and participated in criminal and administrative interviews of witnesses and suspects. I am familiar with the formal methods of darknet narcotics trafficking investigations and illicit money service business investigations, including, but not limited to, electronic surveillance, visual surveillance, covert online surveillance, general questioning of witnesses, search warrants, confidential informants, the use of undercover agents, and analysis of financial records. I have participated in investigations of organizations involved in the

manufacture, distribution, and possession with intent to distribute controlled substances.

## II. PURPOSE OF AFFIDAVIT

3. This affidavit is made in support of a criminal complaint against and arrest warrants for Marvin ANGELITO ("ANGELITO") and Susan GONZALEZ ("GONZALEZ") for a violation of Title 21, United States Code, Sections 841(a)(1): Possession with Intent to Distribute Fentanyl.

4. This affidavit is also made in support of an application for a warrant to search the following cell phones seized from ANGELITO and GONZALEZ's apartment on September 10, 2026 and current in the custody of the FBI in Los Angeles, CA:

a. One Apple iPhone with a cracked screen and serial number DNQXG2DRKPFR ("SUBJECT DEVICE-1");

b. One Apple iPhone with serial number C39XY9GYBKPFR ("SUBJECT DEVICE-2");

c. One Apple iPhone with a pink case bearing serial number G566XP3FP7 ("SUBJECT DEVICE-3");

d. One Apple iPhone with a blue and black case ("SUBJECT DEVICE-4"); and

e. One Apple iPhone with serial number 354503151906687 ("SUBJECT DEVICE-5") (collectively, the "SUBJECT DEVICES"), as described in Attachment A.

5. The requested search warrant seeks authorization to seize evidence, fruits, or instrumentalities of violations of Title 21, United States Code, Sections 841(a)(1) (Possession with Intent to Distribute Fentanyl); 846 (Conspiracy to

Distribute Fentanyl; and 856 (Maintaining a Drug-Involved Premises; and Title 18 United States Code, Sections 924(c) (Possession of a Firearm in Furtherance of a Drug Trafficking Crime), 922(g)(1) (Felon in Possession of a Firearm) (collectively, the "Subject Offenses"), as described more fully in Attachment B. Attachments A and B are incorporated herein by reference.

6. The facts set forth in this affidavit are based upon my personal observations, my training and experience, and information obtained from various law enforcement personnel and witnesses. This affidavit is intended to show merely that there is sufficient probable cause for the requested complaint and warrant and does not purport to set forth all of my knowledge of or investigation into this matter. Unless specifically indicated otherwise, all conversations and statements described in this affidavit are related in substance and in part only, all amounts or sums are approximate, and all dates and times are on or about those indicated.

## III. SUMMARY OF PROBABLE CAUSE

7. In August 2026, the FBI, Drug Enforcement Administration ("DEA"), and local law enforcement agency partners conducted surveillance and controlled-buy operations targeting a Los Angeles-based fentanyl trafficking organization. The operations resulted in the seizure of over 23 kilograms of fentanyl-laced "M30" pills, as well as the identification of key members of the organization and a "stash house" utilized by the group to maintain and store their inventory of bulk-weight

quantities of raw powder fentanyl and fentanyl-laced M30 pills, in furtherance of their drug trafficking activities.

8. The "stash house" was a luxury apartment located at 230 W Olympic Boulevard, Unit 4513, Los Angeles, California, in the Olympic + Hill building, which was occupied by Marvin ANGELITO and Susan GONZALEZ. On September 10, 2026, law enforcement executed a search warrant on the apartment. ANGELITO and GONZALEZ were found inside the apartment with a significant amount of drugs – including fentanyl –, drug manufacturing and mixing equipment, firearms, ammunition, and illegal firearm components, and electronic equipment utilized by criminals to evade law enforcement.

## IV. <u>STATEMENT OF PROBABLE CAUSE</u>

### A. The August 12, 2026 deal for 500,000 M30 pills

9. Between July and August 2026, an FBI Confidential Human Source ("CHS-1")[1] arranged to purchase 500,000 M30 fentanyl pills from a Los Angeles-based drug trafficker named Anthony REA[2] in exchange for $125,000, with the deal to take place on August 12 in the Downtown area of Los Angeles. Because the deal was for

---

[1] CHS-1 has served time in state custody for prior state-level convictions for narcotics possession and sale. CHS-1 is seeking cooperation for pending federal narcotics charges. The video calls, and all subsequent communications with CHS-1 referenced herein, were monitored with the consent of CHS-1. Based on information obtained to date and corroboration of information provided by the CHS-1 it is believed that information provided by CHS-1 is sufficiently reliable.

[2] REA was identified in an FBI investigation as a drug trafficker who sold fentanyl-laced "M30" pills as well as fentanyl powder to customers across the United States, and also to CHS-1 in October and December 2025, and in January, February, March, and May 2026.

such a significant quantity and price, REA agreed to show CHS-1 he did in fact have the drugs on hand.

10. On August 11, 2026, REA arranged a video call to show CHS-1 the drugs he would sell CHS-1 the next day. In connection with the "show and tell," I, and other members of the law enforcement team conducted surveillance on REA. During this time, CHS-1 was in communication with REA by telephone and video calls, and CHS-1 was providing real-time information to an FBI agent who in turn communicated the information to me and my surveillance team.

11. Around 1:50 p.m., the surveillance team saw REA and an associate drive to a Downtown Los Angeles apartment building called Olympic + Hill, located at 230 W Olympic Boulevard, Los Angeles, California.

12. At this time, CHS-1 was on a video call with REA, which CHS-1 recorded and I later viewed. In the video, REA hands his associate the phone outside of the building, and the associate tells CHS-1 about the "stash house" apartment, stating the place is "official" and "cartel shit over here".

13. The associate also tells CHS-1:

- "This is the stash house. They've got everything up there."
- "They don't like to let too many people up there. If somebody robs that shit or something they'll know who to blame it on."
- "Now you know this shit for real."

14. REA's associate then tells CHS-1: "he's coming down from the elevator." At that point the associate hands the phone off to a man with a black hat – later confirmed to be ANGELITO – and gives him the PIN to the phone.

15. The call cuts off when ANGELITO enters the elevator. When the call re-engages, ANGELITO continues to talk and points the camera to a shelf above a sink with a distinctive silver faucet. The shelves are packed completely with 43 bundles of what appear to be blue pills, and four bricks of what appear to be powder fentanyl.

16. On August 12, 2026, CHS-1 and REA met in Downtown Los Angeles to complete the transaction. During the money exchange, which occurred inside REA's vehicle parked in the valet area outside of Javier's restaurant off of Figueroa Street, CHS-1 gave REA $125,000, which REA counted to confirm the amount was accurate. REA then directed an associate to deliver the 500,000 fentanyl M30 pills to an associate of CHS-1 -- another FBI-CHS ("CHS-2")[3] – whom CHS-1 designated to receive the drugs in a parking lot several blocks away.

17. Once REA gave the "green light", a man later identified as RAMIRO MORA arrived in a parking lot several

[3] CHS-2 has prior criminal convictions including illegal entry into the U.S., attempted re-entry after deportation, driving without a valid driver's license, and possession of narcotics with intent to sell. CHS-2 agreed to start cooperating in September 2021, in exchange for favorable consideration regarding his/her immigration status. Based on CHS-2's past cooperation which has led to the identification of new subjects and the seizures of narcotics and narcotics proceeds, it is believed that information provided by CHS-2 is sufficiently reliable. Additionally, the information CHS-2 has previously provided was independently corroborated by investigators.

blocks away driving a gray Toyota Corolla and dropped off a duffel bag containing approximately 23 kilograms of blue "M30" pills[4] to CHS-2. MORA was arrested by federal agents during this transaction. On September 3, 2026, a grand jury in the Central District of California issued an indictment against MORA for distribution of fentanyl in case number 2:26-cr-00573-MWC.

**B. Identifying the "Stash House" Apartment and ANGELITO**

18. In the days after the August 12 deal, I met with an Information Technology specialist at the Olympic + Hill apartment building. The IT specialist showed me surveillance video of the public areas of the building, particularly the areas matching up with the timeline of the August 11 "show and tell" where ANGELITO showed CHS-1 the drugs in his "stash house" via video call.

19. During this video review, the IT specialist and a property manager at the building matched up the key fob audit logs[5] to the video showing ANGELITO. Based on the logs and the video timestamps, management confirmed ANGELITO had a key fob assigned to unit #4513.

20. The relevant timeline of the video footage and audit logs are provided below:

---

[4] Forensic chemists at the Drug Enforcement Administration (DEA) Southwest Laboratory in Vista, CA later confirmed the pills contained fentanyl.

[5] The Olympic + Hill building utilizes an electronic key fob system which allows for key fobs assigned to tenants and specific apartment units to capture and transmit data showing timestamps of door access events, to include the doors to specific units and areas of the building.

- 1:49 p.m.: Video footage showed a Nissan Rogue arrived at the Olympic + Hill building. REA's associate got out of the passenger side door while on a speakerphone or video call.
- 1:51 p.m.: Audit log of door activity showed the front door of Unit #4513, 45th floor inside the building opened from the inside.
- 1:52 p.m.: Video footage showed a Hispanic male wearing a black LA Dodgers baseball cap, i.e., ANGELITO, holding a green-colored lanyard while entering elevator C on the 45th floor. ANGELITO exits on the 1st floor.
- 1:54 p.m.: Audit logs show the key fob assigned as "#4513 Eduardo Velazquez"[6] hit on the door to the mail room, which is the path from the elevator lobby exiting to the outside from the east retail lobby doors on the building. Video footage shows ANGELITO walk out of the building from the retail lobby to the outside of the building and meet up with REA's associate, who hands him the same phone he was using for his call.
- 1:55 p.m.: Video footage showed ANGELITO then used the lanyard key fob to open the same door he came out of

[6] I requested tenant information from the property manager for the building via subpoena and learned the tenants for unit #4513 were "Eduardo Velazquez" and "Daniel Gutierrez". Per management, photo identification and other personal information are verified by a third-party vendor at the time of lease signing, and are not saved by management internally, thus I was not able to see the IDs for the names on the lease.

and walked back inside the building holding the phone from REA's associate. Key fob logs showed the "#4513 Eduardo Velazquez" key fob opened the retail lobby door then the elevator lobby door. Video review backed up the key fob audit trail, showing ANGELITO entering the building, then the elevator, then getting off at the 45th floor. While in the elevator, the camera appears to show ANGELITO is still on a video call. Once ANGELITO exits on the 45th floor, key fob logs showed the "#4513 Eduardo Velazquez" then opened the door to unit #4513.

**C. ANGELITO Supplied the Drugs for the August 12 Deal**

21. I viewed video and key fob audit logs for the #4513 unit for August 12, 2026. The video showed the Olympic + Hill building inside and out from the elevator lobby to the retail lobby to the outside exit towards the valet parking area and the alley. The relevant video footage and key fob audit logs are included below:

- 2:01 a.m.: the key fob log showed an entry to unit #4513 and no activity until 3:37 p.m. the same day.
- 3:33 p.m.: video footage showed a gray Toyota Corolla with CA plate 9GHD026 turn north off of 11th Street into the alley of Blackstone Court. The Corolla then parks near the driveway of the Olympic + Hill building.
- 3:36 p.m.: video footage showed ANGELITO enter the 45th floor elevator pulling a black roller duffel bag.

He is wearing the same black Dodgers hat from the day before when he showed CHS-1 the stash house drugs. ANGELITO exited out of the elevator lobby towards the retail lobby door, still pulling the black roller duffel bag. He then walks out and across the valet area to the rear passenger door of the Corolla and puts the bag inside. The driver does not get out. After the bag is put into the car, the Corolla drives away, turning west out of the alley onto Olympic Boulevard.

- After placing the bag in the car, ANGELITO then walks back inside the retail lobby using a key fob on a green lanyard to access the door. He then takes the elevator up to the 45th floor and exits. The key fob logs show the fob for #4513 was used to enter unit #4513 at 3:40 p.m.

22. At around 3:46 p.m., DEA and FBI agents on scene saw a gray Toyota Corolla arrive in the parking lot off Olive and 9th Street in Downtown Los Angeles. The Corolla parked beside CHS-2's car and the driver, later identified as MORA, retrieved a black duffel bag from the rear passenger side of the car and took the bag to the backseat of CHS-2's car. MORA then placed the bag inside of CHS-2's car.

23. DEA Special Agent Scott Flanigan and his team moved in and arrested MORA. SA Flanigan retrieved the duffel bag from CHS-2's car and saw it contained multiple tightly wrapped cellophane packages the size of a burrito with the number "25"

written on each. I later viewed the packages and saw they contained blue M30 pills and were similar in appearance to the packages of pills I saw in the video from August 11 of the stash house "show and tell" by ANGELITO.

24. My further review of surveillance video and key fob logs indicated ANGELITO and a woman later identified as Susan GONZALEZ were likely the sole occupants of the #4513 unit.

**D. Search Warrant at the "Stash House" Leads to the Seizure of Drugs, Firearms, Drug-Making Equipment, and a Small Alligator**

25. On September 10, 2026, at approximately 5:30 a.m., I and my team executed a search warrant authorized by the Superior Court of California, County of Los Angeles[7] for unit #4513 at the Olympic + Hill building located at 230 W Olympic Boulevard, Los Angeles, California.

26. When the warrant was executed, two individuals were contacted sleeping in the bedroom of the apartment. The two individuals were later positively identified as ANGELITO and GONZALEZ.

27. Immediately after being detained pending clearing of the residence, ANGELITO gave agents a fake name: "Edgar Flores", with a date of birth of March 12, 1992. He stated he did not have a middle name and did not know his Social Security Number. ANGELITO said he did not have any photo identification or even a

[7] This warrant authorized the use of federal agents in execution of warrant, pursuant to California Penal Code Sections 1530 and 1538. The warrant also authorized service anytime, day or night.

wallet. GONZALEZ had a California driver's license in her wallet matching the name she gave the arresting agents.

28. Once the apartment was secure, Special Agents searched the residence. During the initial search of the apartment, a K9 was utilized to decipher potential hidden compartments in the apartment. During the K9 deployment into the apartment, the K9 became disoriented and began to collapse due to suspected fentanyl exposure. The K9 handler had to utilize Narcan to revive the K9.

29. During the search of the apartment, law enforcement recovered the following items:

- Approximately 42,609.14 grams of fentanyl from kitchen cupboards, and deposited throughout the apartment(M30 pills and powder).
- Approximately 1,038.1 grams of heroin, located in the kitchen cabinet.
- Three vials of bromobenzene, located in a container underneath the kitchen sink.[8]
- Approximately 7,198.7 grams of cocaine, located in the kitchen cabinets.
- Laboratory equipment including beakers, mixers, strainers, stirrers, torches and heat-resistant equipment, which from my training and experience are all indicative of a drug lab, located in the bathroom.

[8] A precursor chemical for the drug "PCP". PCP (phencyclidine) is a synthetic drug linked to severe mental side effects including aggressive behavior.

- Packaging equipment, including plastic bags, boxes, and sealing equipment.
- Approximately six kilogram-sized "stamps"[9] with residue used to imprint on the kilograms that were apparently being made in the fentanyl lab in the apartment, located in kitchen drawers and on the balcony.
- A hydraulic press used to pressure stamp the kilogram bricks being made inside the apartment, located in the hallway closet.
- Barrels of binding powder for mixing with fentanyl, located in the kitchen and living room.
- An AR-15 rifle with ammunition, located in the hallway closet.
- A Desert Eagle 50-caliber pistol with ammunition, located on the kitchen counter. This firearm had a "switch" in the case, which I know from training and experience turns the firearm into a fully automatic weapon.
- A pistol carbine conversion kit, located in a kitchen cabinet.
- A "Signal radio jammer"[10] device, located in the kitchen cabinet.

---

[9] "Stamps" are used by drug traffickers to imprint unique logos or designs on their kilogram bricks of fentanyl or cocaine.

[10] Based on my training and experience, drug dealers use signal jammers to block wireless communications and electronic tracking, particularly in "stash houses" to prevent law enforcement or rival groups from tracking their movements and

*(footnote cont'd on next page)*

- A police radio which matched the model type used by the Los Angeles Police Department, located in the kitchen cabinet.
- Dozens of $1 USD bills[11] in a kitchen drawer.
- A small alligator, which was seized by U.S. Fish and Wildlife Service agents.
- SUBJECT DEVICES 1 through 5 near a bed.
- Clothing which was consistent with those worn by ANGELITO during the investigation, including a black Dodgers hat, black basketball shoes, and gray Nike sweatpants.

shipments. Jammers create radio frequency interference that scrambles nearby cellular, Wi-Fi, and listening device signals, making real-time audio or data transmission difficult for investigators.

[11] Based on my training and experience investigating drug traffickers, I know a common method they use to verify customers for pickup/dropoffs of drugs is the “dollar token” method, wherein a drug buyer will send a photo of dollar bill showing the serial number, and the dealer provides a photo of that bill to his “runner” who will then ask the buyer to see the bill during the transaction to validate the buyer.

30. Photographs of the contraband and the alligator seized during the execution of the warrant are included below:







31. During this operation, a Clandestine Lab Team was utilized due to the harmful chemicals that were being used in the apartment. The team field tested the different suspected narcotics and confirmed the presence of fentanyl, cocaine and heroin in the seized substances.



**E. Efforts by ANGELITO to falsify his identity**

32. Agents read ANGELITO his Miranda rights to which he acknowledged he understood. During the interview, I and other agents attempted to ascertain ANGELITO's true identity. From the initial contact with ANGELITO, he insisted his name was "Edgar Flores" with a date of birth of March 12, 1992. I requested and obtained a California driver's license for "Edgar Flores" with the date of birth provided by ANGELITO, and the picture of the person in the DL photo had a tattoo on the right side of his forehead. ANGELITO did not have a tattoo on his forehead. The photo date on the Edgar Flores photo was September 1, 2026.

33. Multiple times, I and other agents asked ANGELITO questions giving him the opportunity to truthfully identify himself. I asked him if he went by any other names or nicknames, and he stated he did not.

34. At approximately 11:01 a.m., officers from the Los Angeles Police Department Central Division arrived at the apartment and acquired an electronic fingerprint from ANGELITO. From this, law enforcement was able to confirm that this print matched a prior arrest record for "Marvin ANGELITO, DOB: 07/22/1999". The mugshot associated with the arrest matched the appearance of ANGELITO. At that point, ANGLITO did not dispute it was him.

**F. GONZALEZ Association with the "Stash House"**

35. On September 4, 2026, the property manager at the Olympic + Hill apartments told me that on September 3, 2026, a woman who gave the name "Kimberly Belino" attempted to pay rent

in person with what appeared to be money orders or cashier's checks. She was denied because management has a policy that only tenants listed on the lease can pay rent in person,[12] which is a policy in place to mitigate fraudulent renters.

36. I showed the property manager a photo of GONZALEZ. The property manager confirmed this was the woman who gave the name "Kimberly Belino" and tried to pay the rent on September 3. Accordingly, I believe GONZALEZ provided a fake name to avoid associating her true identity to a residence she knew was a drug facilitation premises. Additionally, I believe she was attempting to pay the rent for ANGELITO in order to keep him anonymous with apartment management, knowing he is a full-time drug trafficker operating a stash house in the apartment.

37. Agents read GONZALEZ her Miranda rights to which she acknowledged she understood. During the interview, GONZALEZ provided consent to search SUBJECT DEVICES 1, 2, and 3. GONZALEZ provided the access codes for SUBJECT DEVICES 2 and 3, but did not have the passcode for SUBJECT DEVICE 1.

38. Agents conducted a manual review of the text messages and photos found within SUBJECT DEVICE 3. A review of the photos revealed multiple photos of GONZALEZ holding firearms and

[12] The manager provided a payment history showing most of the time, rent on unit #4513 was paid using multiple checks or money orders in smaller increments adding up to the full rent amount. Based on my training and experience, I have found drug dealers or other criminals utilize money orders or cashier's checks to pay rent in order to avoid a "paper trail" showing their true identity linked to payments, and they will often use multiple smaller checks to avoid showing identification at check cashing stores.

holding large stacks of what appears to be United States currency.

39. Specifically, agents observed approximately six (6) photos of large quantities of what appears to be United States currency. Among these photos are photos depicting GONZALEZ holding large stacks of cash to the side of her head where ANGELITO can be seen in the background holding what appears to be an AK-style firearm. An additional series of photos depict a stack of what appears to be U.S. currency banded and wrapped in plastic wrap.

40. Based on my training and experience, I know individuals involved in the trafficking of controlled substances often times receive payment in cash and will need to package these proceeds in order to move and conceal the funds, as well as for the repayment of funds owed to the source of the controlled substance. I know that individuals involved in the distribution of controlled substances often times wrap bulk cash in plastic wrap in an effort to conceal the funds from law enforcement and avoid the detection by law enforcement working dogs trained to alert on bulk cash.

41. A review of the photos in SUBJECT DEVICE 3 related to firearms revealed approximately nine (9) images and videos of firearms, including four (4) images where GONZALEZ can be seen holding a silver 1911-style pistol and an AK-style firearm with a pistol grip and what appears to be a high-capacity magazine.

42. When asked "how long have you known Marvin?" GONZALEZ stated that she has known him since they were in school and that

he was a year or two ahead of her. When later specifically asked the name she knows ANGELITO to use, GONZALEZ said that she knows him as "Edgar."

43. When asked about her involvement in the activity going on in the residence, GONZALEZ indicated that she did not ask questions and was unaware[13] of what was going on in the residence, and that she works in accounting. When asked where she works, GONZALEZ stated that she works in the jewelry district of Downtown Los Angeles. When asked the name of where she works GONZALEZ indicated that she works at Immaculate Jewelry doing accounting. Agents then referenced a text message conversation found in SUBJECT DEVICE 3 with a contact name which included the word Immaculate and also indicated that GONZALEZ no longer works there. GONZALEZ acknowledged that this was correct, but that it just happened recently. Agents indicated that based on the text messages it appeared that GONZALEZ hadn't worked there for a while.

**G. ANGELITO's Prior Felony Convictions**

44. I queried ANGELITO's criminal history with the National Crime Information Center ("NCIC") and discovered he has a 2018 felony conviction for California Penal Code 25850(a), carrying a loaded firearm on your person or in a vehicle while in a public place.

---

[13] When agents entered the apartment to initiate the search, drugs, firearms, packaging, and lab equipment were spread throughout the living room and other areas of the house, out in the open, with no obvious intent to hide or conceal anything.

## V. TRAINING AND EXPERIENCE ON DRUG OFFENSES

45. Based on my training and experience and familiarity with investigations into drug trafficking conducted by other law enforcement agents, I know the following:

a. Drug trafficking is a business that involves numerous co-conspirators, from lower-level dealers to higher-level suppliers, as well as associates to process, package, and deliver the drugs and launder the drug proceeds. Drug traffickers often travel by car, bus, train, or airplane, both domestically and to foreign countries, in connection with their illegal activities in order to meet with co-conspirators, conduct drug transactions, and transport drugs or drug proceeds.

b. Drug traffickers often maintain books, receipts, notes, ledgers, bank records, and other records relating to the manufacture, transportation, ordering, sale and distribution of illegal drugs. The aforementioned records are often maintained where drug traffickers have ready access to them, such as on their cell phones and other digital devices, and in their residences.

c. Communications between people buying and selling drugs take place by telephone calls and messages, such as e-mail, text messages, and social media messaging applications, sent to and from cell phones and other digital devices. This includes sending photos or videos of the drugs between the seller and the buyer, the negotiation of price, and discussion of whether or not participants will bring weapons to a deal. In addition, it is common for people engaged in drug trafficking to

have photos and videos on their cell phones of drugs they or others working with them possess, as they frequently send these photos to each other and others to boast about the drugs or facilitate drug sales.

d. Drug traffickers often keep the names, addresses, and telephone numbers of their drug trafficking associates on their digital devices and in their residence. Drug traffickers often keep records of meetings with associates, customers, and suppliers on their digital devices and in their residence, including in the form of calendar entries and location data.

e. Drug traffickers often use vehicles to transport their narcotics and may keep stashes of narcotics in their vehicles in the event of an unexpected opportunity to sell narcotics arises.

f. Drug traffickers often maintain on hand large amounts of United States currency in order to maintain and finance their ongoing drug trafficking businesses, which operate on a cash basis. Such currency is often stored in their residences and vehicles.

g. Drug traffickers often keep drugs in places where they have ready access and control, such as at their residence or in safes. They also often keep other items related to their drug trafficking activities at their residence, such as digital scales, packaging materials, and proceeds of drug trafficking. These items are often small enough to be easily hidden and thus may be kept at a drug trafficker's residence even if the drug

trafficker lives with others who may be unaware of his criminal activity.

h. It is common for drug traffickers to own multiple phones of varying sophistication and cost as a method to diversify communications between various customers and suppliers. These phones range from sophisticated smart phones using digital communications applications such as Blackberry Messenger, WhatsApp, and the like, to cheap, simple, and often prepaid flip phones, known colloquially as "drop phones," for actual voice communications.

## VI. TRAINING AND EXPERIENCE ON FIREARMS OFFENSES

46. From my training, personal experience, and the collective experiences related to me by other law enforcement officers who conduct who conduct firearms investigations, I am aware of the following:

a. Persons who possess, purchase, or sell firearms generally maintain records of their firearm transactions as items of value and usually keep them in their residence, or in places that are readily accessible, and under their physical control, such in their digital devices. It has been my experience that prohibited individuals who own firearms illegally will keep the contact information of the individual who is supplying firearms to prohibited individuals or other individuals involved in criminal activities for future purchases or referrals. Such information is also kept on digital devices.

b. Many people also keep mementos of their firearms, including digital photographs or recordings of themselves

possessing or using firearms on their digital devices. These photographs and recordings are often shared via social media, text messages, and over text messaging applications.

c. Those who illegally possess firearms often sell their firearms and purchase firearms. Correspondence between persons buying and selling firearms often occurs over phone calls, e-mail, text message, and social media message to and from smartphones, laptops, or other digital devices. This includes sending photos of the firearm between the seller and the buyer, as well as negotiation of price. In my experience, individuals who engage in street sales of firearms frequently use phone calls, e-mail, and text messages to communicate with each other regarding firearms that the sell or offer for sale. In addition, it is common for individuals engaging in the unlawful sale of firearms to have photographs of firearms they or other individuals working with them possess on their cellular phones and other digital devices as they frequently send these photos to each other to boast of their firearms possession and/or to facilitate sales or transfers of firearms.

d. Individuals engaged in the illegal purchase or sale of firearms and other contraband often use multiple digital devices.

## VII. TRAINING AND EXPERIENCE ON DIGITAL DEVICES[14]

47. Based on my training, experience, and information from those involved in the forensic examination of digital devices, I know that the following electronic evidence, inter alia, is often retrievable from digital devices:

a. Forensic methods may uncover electronic files or remnants of such files months or even years after the files have been downloaded, deleted, or viewed via the Internet. Normally, when a person deletes a file on a computer, the data contained in the file does not disappear; rather, the data remain on the hard drive until overwritten by new data, which may only occur after a long period of time. Similarly, files viewed on the Internet are often automatically downloaded into a temporary directory or cache that are only overwritten as they are replaced with more recently downloaded or viewed content and may also be recoverable months or years later.

b. Digital devices often contain electronic evidence related to a crime, the device's user, or the existence of evidence in other locations, such as, how the device has been used, what it has been used for, who has used it, and who has been responsible for creating or maintaining records, documents,

[14] As used herein, the term "digital device" includes the SUBJECT DEVICES and any electronic system or device capable of storing or processing data in digital form, including central processing units; desktop, laptop, notebook, and tablet computers; personal digital assistants; wireless communication devices, such as paging devices, mobile telephones, and smart phones; digital cameras; gaming consoles; peripheral input/output devices, such as keyboards, printers, scanners, monitors, and drives; related communications devices, such as modems, routers, cables, and connections; storage media; and security devices.

programs, applications, and materials on the device. That evidence is often stored in logs and other artifacts that are not kept in places where the user stores files, and in places where the user may be unaware of them. For example, recoverable data can include evidence of deleted or edited files; recently used tasks and processes; online nicknames and passwords in the form of configuration data stored by browser, e-mail, and chat programs; attachment of other devices; times the device was in use; and file creation dates and sequence.

c. The absence of data on a digital device may be evidence of how the device was used, what it was used for, and who used it. For example, showing the absence of certain software on a device may be necessary to rebut a claim that the device was being controlled remotely by such software.

d. Digital device users can also attempt to conceal data by using encryption, steganography, or by using misleading filenames and extensions. Digital devices may also contain "booby traps" that destroy or alter data if certain procedures are not scrupulously followed. Law enforcement continuously develops and acquires new methods of decryption, even for devices or data that cannot currently be decrypted.

48. Based on my training, experience, and information from those involved in the forensic examination of digital devices, I know that it is not always possible to search devices for data during a search of the premises for a number of reasons, including the following:

a. Digital data are particularly vulnerable to inadvertent or intentional modification or destruction. Thus, often a controlled environment with specially trained personnel may be necessary to maintain the integrity of and to conduct a complete and accurate analysis of data on digital devices, which may take substantial time, particularly as to the categories of electronic evidence referenced above. Also, there are now so many types of digital devices and programs that it is difficult to bring to a search site all of the specialized manuals, equipment, and personnel that may be required.

b. Digital devices capable of storing multiple gigabytes are now commonplace. As an example of the amount of data this equates to, one gigabyte can store close to 19,000 average file size (300kb) Word documents, or 614 photos with an average size of 1.5MB.

49. The search warrant requests authorization to use the biometric unlock features of a device, based on the following, which I know from my training, experience, and review of publicly available materials:

a. Users may enable a biometric unlock function on some digital devices. To use this function, a user generally displays a physical feature, such as a fingerprint, face, or eye, and the device will automatically unlock if that physical feature matches one the user has stored on the device. To unlock a device enabled with a fingerprint unlock function, a user places one or more of the user's fingers on a device's fingerprint scanner for approximately one second. To unlock a

device enabled with a facial, retina, or iris recognition function, the user holds the device in front of the user's face with the user's eyes open for approximately one second.

b. In some circumstances, a biometric unlock function will not unlock a device even if enabled, such as when a device has been restarted or inactive, has not been unlocked for a certain period of time (often 48 hours or less), or after a certain number of unsuccessful unlock attempts. Thus, the opportunity to use a biometric unlock function even on an enabled device may exist for only a short time. I do not know the passcodes of the devices likely to be found in the search.

c. Thus, the warrant I am applying for would permit law enforcement personnel to, with respect to any device that appears to have a biometric sensor and falls within the scope of the warrant: (1) depress ANGLITO and/or GONZALEZ's thumb and/or fingers on the device(s); and (2) hold the device(s) in front of ANGELITO and/or GONZALEZ's face with his or her eyes open to activate the facial-, iris-, and/or retina-recognition feature.

50. Other than what has been described herein, to my knowledge, the United States has not attempted to obtain this data by other means.

## VIII. CONCLUSION

51. For all the reasons described above, there is probable cause to believe that ANGELITO and GONZALEZ violated Title 21, United States Code, Sections 841(a)(1), possession with intent to distribute fentanyl.

52. Further, there is probable cause to believe that the items listed in Attachment B, which constitute evidence, fruits, and instrumentalities of violations of the Subject Offenses will be found in the SUBJECT DEVICES, as described in Attachment A.

/s/
BRENT JAMES, Special Agent
Federal Bureau of Investigation

Subscribed to and sworn before me this 11th day of September, 2026.

HONORABLE DIANE M. KWOK
UNITED STATES MAGISTRATE JUDGE